Good morning, Your Honors. I'm Ed Rucker, representing the Appellant and Petitioner. I'm joined this morning by Gwen Freeman. The initial issue we would ask the Court to discuss is whether trial counsel was deficient in the penalty trial that LaBelle Frierson received. Deficient in not performing the reasonable, thorough investigation into mitigation evidence that was readily available, as required by the standards set forth by the Supreme Court in Wiggins, Williams, Rompia, the ABA standards that the Court refers to, and the long line of unbroken precedent that this Court has set out most recently in Earp v. Stokes, Silva, Douglas, Karras, Ainsworth, all cases cited to the Court in our briefs. We feel that this performance was deficient, that the Petitioner was prejudiced by it, in that we feel if this compelling evidence had been presented, one juror might have reached a different decision as to the penalty, which is the standard that Wiggins sets out. Under the 1977 law, which this Petitioner was tried under, that would require a life sentence. The remedy we're requesting with regard to this claim is a new penalty trial. The result of that would leave intact a first-degree murder conviction, a finding of the truth of the special circumstances, which automatically results in Lavelle Frierson receiving a sentence of life without the possibility of parole. You're no longer challenging the special circumstances case? No, we are challenging them, Your Honor, but with regard to this claim itself, that would be the remedy. He would receive a new penalty trial. We are challenging the sufficiency of the preparation and presentation of mental health evidence with regard to special circumstances, but in dealing with the penalty trial, which I think is most egregious, that would be the remedy that we would seek. The readily available evidence that trial counsel could have obtained if he had performed the type of investigation that the Supreme Court requires him to perform, as well as this Court requires him to perform, would be compelling evidence of violence inflicted on the petitioner during his childhood, a history of organic brain damage, a chronic use of drugs which he sought as an escape from that child abuse, a family history that made this type of treatment of him almost inevitable because of his mother's background. And as such, we feel that there would have been a different result that had been obtained had that been done. Now, the cases that you just cited, they teach us that you look at the available evidence that could have reasonably been presented, as you just listed this. Let's just take that. But you look at all the evidence that was presented at the trial, as well. That's correct. So it would help me if you would just respond to the notion, you know, the other aggravating evidence that was presented at the penalty phase was the killing when he was a young man. Yes, that's correct. And the two armed robberies. Correct. And those folks, you know, the individuals, the victims of those two armed robberies testified. That is correct. And then there was some pretty graphic evidence of the killing of, what was his name, Mr. Green, the Green homicide. So if you have that aggravating evidence and you have this available mitigating evidence, I guess your argument is that despite that pretty strong mitigating evidence, this other would reach a decision. But not only that, I think it has to be examined a little more closely than that. And that is this, that this court has decided in Hendricks that no matter how horrific the underlying case is and no matter how strong the aggravating evidence, that does not preclude the fact that prejudice might result from the not presenting mitigation evidence. I understand that. I'm just wondering, how do you, in this particular case, how do you? And the way we would address that is as follows. One, that that mitigation evidence should have been presented in a coherent fashion. And that is that if the child abuse had been to any of the siblings, this trial counsel did not question a single one of the brothers or sisters that lived with this petitioner during his lifetime, did not question a single cousin that lived next door and was with him that entire time. So they present the child abuse evidence. They present the mother's background where she grew up on the exact same cotton plantation that her grandmother was a slave on. And as a consequence of the economics of that situation, the family could only choose one child that would not work in the fields, one child that could go to school. They did not choose his mother. She resented that, that loss of opportunity. So when confronted with a child who unknowingly had organic brain damage and a learning disability, she punished him severely for his inability to perform in school, which explains why, from this punishment, he sought drugs. Now, do I recall correctly that the district judges, I don't remember if it was Judge Moreno or Judge Pergerson, expressed concern about whether this evidence was even credible? Yes, he did. If I might just finish the answer to Judge Paez, and then I will address that, and that is to address the Green Homicide. This court has found in Boyd v. Brown that the proper analysis is to look at the admissible evidence in aggravation, whether the evidence was kept out or the evidence was allowed in improperly. This evidence with regard to the Green Homicide tragically was not presented that there is a reasonable probability that the petitioner, Lavelle Frierson, was factually innocent of the Green Homicide. And the reason I say that is this, that the police reports, this was a juvenile adjudication at the time when he was 14 years old. The police reports indicate that four different individuals at the time of the shooting identified an individual named White as the person with the gun. An eyewitness named McCain, who also testified in the penalty trial in this case, identified White as the shooter. White confessed that after he was acquitted in the juvenile proceedings and later interviewed by an investigator for Lavelle Frierson, he confessed that he was the shooter. Maybe he did, maybe he didn't. He says he didn't. Well, he says he didn't when trial counsel sat idly by knowing he'd been acquitted and suggested to the court that he'd be allowed to take the Fifth Amendment. He testified under oath that he didn't confess, didn't he? No. Yes, he did at a pre-trial at the jury. Not in front of the jury, excuse me, Your Honor. Not in front of the jury, but in front of the judge. In front of the judge he did. But that does not, in essence, take away the fact that he said that at the time he was told he might be prosecuted by this, which is not legally proper. And the district court found was an error not to allow that evidence in. If that evidence had been allowed in, the only evidence against Lavelle Frierson that he committed this crime as a juvenile was the testimony of a detective who said that he heard three voices. No, that's not the only evidence either. There was also a juvenile adjudication where he was found guilty of that offense. That's what I'm referring to. In that juvenile adjudication, the only evidence against him... I'm saying the juvenile adjudication is a judgment that he is guilty. It is, but not admissible in California. But it came in and California Supreme Court said it was properly admitted. Well, because in essence, the facts of the case would have come in. But the fact that it came in as a judgment should not have been admitted under California law. And if we have that, there's a serious question of whether one juror might have some doubt as to his guilt of that prior homicide. If there is doubt as to that prior homicide, we are left with a robbery that went bad, as tragic as it was, and two robberies during the same period of time in which no one was injured. Now with regard to the fact that these witnesses, according to the district court, would be biased in favor of LaVell Frierson. It's not just biased, there were other circumstances. The tardy reporting of this and other things made him question whether this was believable at all. Plus that it was contradicted by, or at least not corroborated by other evidence. That is correct. But this court, the district court, made no credibility finding with regard to these witnesses, whether they lied or not, because they never testified in front of the testimony. They allowed testimony only by declaration. And in IRC, this court has found that the court is not required to give great deference to any findings such as that when it's based solely on declarations. There was no cross-examination with regard to these witnesses on the facts of child abuse. The court did not see them testify. And there was no issue of this in the trial. The Attorney General conceded that this abuse occurred in oral argument. The state's expert, Dr. Maloney, admitted that this child abuse occurred. And the way it would be presented to a jury to overcome the very normal bias, because child abuse is going to occur in a home where the family members are. These are secret things that happen. They're not done out in the public square. You do it by presenting a number of witnesses that have consistent stories of this abuse. We have eight or ten declarations that your honors could see that talk about it. And the facts that are telling, that are consistent. And that is the sounds of a belt coming through the air that Bobby Frierson heard, smacking down on the naked body of his brother who was tied hands to his feet at the age of nine years old. The welts and cuts on their body. The sounds that came out of the house. The welts and cuts, was there any medical evidence of that? There's no contemporary medical evidence of that. And the reason is... No school records? The council didn't obtain the school records. But if he had, there would not be. And the reason is, in the 1960s, as the school teacher, Ms. Herring, testified, this was a different time. This was not something that people inquired into. All the school children who played with him, if they touched him on the back, saw him wince away when this happened. The neighbors who saw him hide in abandoned buildings and would bring him food when he would be out for weeks at a time to escape his mother, could testify to this. And the children who made up a song that he was getting a beating because they could hear it, could testify to this. And not all the witnesses were family members or friends. There was a college administrator who came in and testified, a Mr. Herring, who had not seen Lavelle for 27 years, had no contact with his family for 27 years, wasn't a friend of his when they were growing up together because he was much older. He testified that he was aware of these beatings. He could hear it in the next house over. He could see Lavelle jump over fences to escape his mother as she tried to hit him with belts and extension cords. And his first memory of it was when Lavelle Frierson was four years old. They were playing in the front yard. For some reason, his mother burst out of the house with an extension cord, started beating Lavelle in front of all the other children, for no explanation whatsoever that this occurred. So this is not evidence that I feel a jury would have any question that it existed. The question is, as Your Honor puts, whether there would be any prejudice from this. And clearly, I think, would be if the standard is to convince one juror. Because this court has given itself guidance with regard to whether the standard with regard to prejudice is one that affects this court individually as individuals or trying to figure out how one juror might feel about it. Because I have tried personally ten death penalty cases. And the way I view this evidence might be different than another attorney. Your Honors have seen several death penalty cases and reviewed the records. That affects the way you would be impacted by this evidence. So the court, I believe wisely, has taken out that personal evaluation of the impact of this evidence. And if I might read to the court what the court's holding was in Smith v. Stewart, where it said, in assessing prejudice in a case like this one, we are presented with a particularly difficult, practical, and jurisprudential question. Because we are not asked to imagine what the effect of certain testimony would have been upon us personally. We are asked to imagine what the effect might have been on a sentencing judge who was following the law, especially one who heard the testimony at trial. Mitigating evidence might well have one effect on the sentencing judge without having an effect on a different judicial officer. And this holding, of course, would apply to jurors, because this was a court trial, as it would to a judicial officer. So would this mitigating evidence, which is conceded by the state, occurred, presented in the form of live testimony before a jury, with the facts, the telling facts of the sounds, the smell when he lost control of his bladder and crawled back into his room with his brothers, his then attempt to anesthetize himself with drugs, because drugs alone presented as a history of abuse, is far less compelling as mitigation evidence, even admitted by trial counsel, unless there's a reason for it. Because jurors want to know why an individual who is sitting before them, in which they are to make a decision of life and death on, how did that person get there and how did he commit these crimes? It's a natural question. What they were presented with was, in essence, a false picture of who Lavelle Frierson was. They were presented with a picture that he had, quote, a normal life, with caring parents, and nobody else in the family had a problem. That's not true. He was subjected to this at the age of four years old, to the point where he was beaten while he was naked all over his body, including his genitals, at the age of nine while his feet and hands were tied together. Now, that evidence would then explain to a jury, according to the state's expert, Dr. Maloney, that a very common method for children to deal with that type of violent environment is to seek to escape into drugs, which the evidence is uncontradicted. He did it at an incredibly young age of ten years old, which, once again, is a sign of why he's doing it. His running away from home could be explained to the jury because of that, because even at that time, he complained in probation reports of the excessive punishment of his mother. I have a probation report that I think you're referring to. It says he left home on these occasions because he did not like his mother's punishment. Is that the document you're referring to? That's one of them, yes. He says he states that when he was asked to go to a friend's house, when he's being restricted for running away, and his mother will not allow him to do so, and he leaves and does not return, the minor says his siblings have the same restrictions placed on them, but he does not like being punished. He's talking about he doesn't like being grounded. Is that what you're referring to? I'm not referring to grounded. What I'm referring to is what the state expert, Dr. Maloney, said. Let's just stick with the probation report for a second. Is there anything else in the probation report? One trial lawyer admitted... I'm talking about the probation report. The abuse that is cited in there talks about not only that he ran away. It also has that he ran away at age of 12 in one of the reports five or six times in a three-month period. I'm trying to pin you down. You said there was information in the probation report that he said he suffered terrible punishment at the hands of his mother. As far as I can tell in the probation report, he's complaining that he, like his siblings, he wouldn't be allowed to go to a friend's house. That is what a probation officer put in the report. You brought up the report, so I'm trying to find out where the terrible punishment is listed here. The terrible punishment is not listed there because he wasn't asked about it by the probation department. The probation report really doesn't add anything to the mix. Would that be fair to say? It does add things to the mix, Your Honor, because any defense lawyer looking at the state's expert, according to our Strickland expert, that these were red flags that something was going on at home. When you have a mother who tells trial counsel he had a normal life and you have a history of chronic running away with complaints about punishment, which the probation department didn't follow up on. So what he says in there, your argument is that when he complains to the probation officer he doesn't like being grounded, that should have been a red flag that there was physical abuse going on. When he complains about punishment, yes. And when it is accompanied by a history of chronic running away, yes. When it is in the probation report that when the probation officer says to him he's going to recommend he go to camp or whatever and the boy sits there numbly, according to the probation report, that is a clear sign that something is going on. Particularly when you run away chronically and still go to school. Why would you go to school if you just wanted to be rebellious and lead your own life? You go to school because you're escaping something and you're escaping what's happening to him at home and there was no problem in proving what was happening to him at home. It would take one telephone call. The constant premise of all the cases that this court has decided is that the very first thing counsel must do is to conduct a reasonable, complete investigation into available mitigation evidence. And this was not done in this case. If it had been done, this is so readily available and so provable to a jury that a totally different picture would have been presented to that jury, a different verdict by one of the jurors. And I think it would have. And I think a reasonable reading of the record is that there's a reasonable probability. And I don't know how the court can have confidence in a verdict of death when none of this mitigation evidence that was readily available was presented to the jury. None. All it would have taken is one telephone call to a brother, a sister, a cousin who lived next door. One telephone call. All these people came forward once they were asked to testify. And how are they expected to know what the legal significance of his background is in a penalty trial? This is not because we deal with it on an everyday basis. Perhaps something that we acknowledge should have been brought forth, but every citizen doesn't know that. They don't know that they're supposed to bring out the family secret because in some way this is supposed to help and they're supposed to do the job of the lawyer who never conducted an actual interview of the mother. Six months after he was appointed, he went to, quote, introduce himself to her and listen to what she had to say. And what she had to say was he had a normal childhood. What does that mean? The state's expert, Dr. Maloney, explained that many people in this situation do not specifically talk about the abuse in the home for several reasons. One, they may be ashamed of it. Two, they may not know the legal significance of it and if they're not asked and the district court made a specific finding that the mother was not asked about child abuse in the home, that LaVell Frierson was never asked by his own lawyer about child abuse. And these are themes that are longstanding and understood by the defense community. And without a probing interview required by Smith v. Stewart, you don't know whether normal to her includes beating the heck out of her kid every day. He was examined by Drs. Gillick and Siegel and, do I understand correctly, they never identified any child abuse? They never inquired into it and they were not hired for that purpose. Well, Gillick did a full-blown psychiatric evaluation. Of the mental state at the time of the crime, never asked a question about child abuse. Siegel was retained by previous counsel as a psychopharmacologist. This trial lawyer, when he allegedly read the transcript, would have seen that this psychopharmacologist would come in and testify that LaVell Frierson was severely intoxicated at the time of the trial and he wrote a report that contained his drug history. He was examined by a psychiatrist at San Quentin. He was? And the psychiatrist at San Quentin didn't identify any child abuse? Well, it depends on which one. He was examined by three. Nuremberger? Never talked to by trial counsel. I'm not asking if he was talked to by trial counsel. Nuremberger never identified in his reports any child abuse. That's not correct, Your Honor. Show me where Nuremberger is. He says that he has symptoms that are consistent with abuse in the home. Can I provide that to the court in reply? Sure. All right. So without a presentation... You're not talking about organic brain injury. You're talking about abuse? Abuse. He said that he had a profile consistent with that. With abuse in the home? Yes. And was never, even though he had spoken to the guilt investigator, there was no penalty by this trial counsel. Even though he spoke to the guilt investigator and said he'd be willing to speak to trial counsel, trial counsel never picked up the phone and spoke to him. So I'd like to reserve some time. I don't know how much I've got left, but... You've got about five minutes or so. Okay. Thank you. Thank you, Mr. Rucker. Thank you. Good morning, Your Honors. I'd like to focus first... Could you identify yourself for the record? I'm sorry, Your Honor. And talk into the mic if you would. Thank you. Deputy Attorney General Stephen Matthews for the respondent. I'd like to focus the court on what was focused on for most of the argument by counsel, and that's the allegations regarding child abuse. These issues were, of course, all fully litigated before Judges Moreno and Judge Pragerson, who both made findings and legal conclusions based upon the entirety of the evidence presented by counsel. Counsel, of course, is attempting now to relitigate that. The point about abuse, first of all, the respondent never conceded that such abuse took place. The respondent at argument stated that our point was never been that it did not occur, or we did not concede that that abuse occurred. And in fact... What did you say again? Our statement at argument was not conceding that abuse occurred. Yes. What did you say exactly in the argument? Say that again. I believe my statement at the argument, I believe that was me, was that our point has never been that it did not occur, because... And then I went on to state that our point was, is that counsel in the position of trial counsel in Frierson 3, the special circumstance and penalty phase, was not under an obligation based upon what was before him to do an independent investigation into child abuse. And this was the precise issue that Judges Pragerson and Moreno was presented to them, and based upon the entirety of the counsel would not have been prompted to do an independent abuse investigation, and there was several reasons for that. One of them was that both Petitioner and his parents never mentioned it to him or his investigators. But more importantly, Petitioner's mother had already testified, and remember we're talking about a second retrial when counsel came, that's the counsel we're talking about. The Petitioner's mother had already testified once that he was not beaten or mistreated. And that's at the record... Would you expect her to admit that? Would you expect her to say I was an abusive parent? Well, I think they... I don't know whether parents would admit it. I do know that both counsel, prior counsel, and Petitioner's expert, Dr. Gillick, testified on speaking to the mother that they didn't believe she was hiding anything, and that Dr. Gillick came to the case from a good background. So the fact that the counsel now was facing... This is when counsel came into the case, that he had already before him the sworn testimony of his mother in court in Petitioner's presence that he was not beaten or abused. And in addition to that, of course, Mr. Frierson, Petitioner's father, testified as well that he was not presented... Also was faced with a declaration from Petitioner's mother from 1979, those were the habeas proceedings, that showing, once again showing a caring and concerned mother, no mention or reference to abuse and references to good childhood. In addition, Mrs. Frierson, and this was found significant by Judges Moreno and Pragerson, told the penalty phase investigator, Casey Cohen, an experienced death penalty well-known defense investigator, the penalty phase investigator for the first retrial, that Petitioner's childhood was normal, and that was a fact recognized and found by Judges Pragerson and Moreno. In addition, no person interviewed by Casey Cohen in his preparation for the penalty phase trial divulged such information, and Investigator Cohen was the penalty phase investigator for Frierson too. Is it clear in the record that counsel, what's his name, Lehman? That's correct, Arnold Lehman. Had he reviewed all of that information before this case? Well... Before the third retrial? No, and in fact, some of it he did, some of it he didn't. But did he review the information you just described to us? I believe that he testified that he was not, didn't believe that he reviewed Casey Cohen's file prior to this, but... Don't you find that troubling? That counsel did not himself, or did not recall in 1990 or 2001 that he, that he didn't believe he had specifically reviewed Casey Cohen's file. Because the problem is, Your Honor, is that I'm trying to... What's your impression, or what's your sense from the record here that Lehman, what did he actually review and study and prepare prior to the third retrial? Well, in fact, Your Honor... It's very difficult to figure out. If you... It doesn't even look like he read the transcript of the trial, of the second trial. Well, in fact, Your Honor, if you look at the findings of Judges Pragerson and Moreno, which looked at the entirety of the case, the best case that the Habeas Council was able to present after a decade of litigation and discovery and teams of experts and investigators, that after reviewing the entirety of this case, they came to the conclusion, Judge Pragerson, this is excerpts at 3025, that trial counsel's strategy at the penalty phase was both understandable and reasonable. Judge Pragerson further stated it, 3023 of the excerpts. Trial counsel faced an extraordinarily difficult task at the penalty phase. The aggravating evidence to be admitted against the petitioner was undeniably strong. And went further at 3028. The aggravating factors were strong. And then, most importantly, Judge Pragerson, at 3029 of the experts, looking at the entirety of the case presented, the mitigating case presented by Habeas Council, came to the conclusion that the mitigating evidence, this is the quote from Judge Pragerson, that the mitigating evidence that counsel failed to introduce at the penalty phase is likewise neither compelling nor exculpatory. And in referring to the penalty phase case that counsel did investigate and present before the jury, particularly regarding the chief aggravating factor, which was the prior juvenile homicide, Judge Pragerson, at 3024 of the experts, of the excerpts, excuse me, concluded it is somewhat remarkable that trial counsel was able to surround the Green juvenile homicide in a shroud of mystery. And I think if the court were to examine the record on that, what the court would find is, what counsel did present of that was that counsel presented the evidence, testimony of Philip McCain, who witnessed the shooting, testified that a gang-related fight had broken out where Green was killed, that Petitioner was not involved, and he identified White as the killer. This is counsel's case at the penalty phase. McCain further testified that White called him and confessed to the shooting. That was evidence before the jury at the penalty phase, presented by trial counsel, Arnold Lehman. He also presented the testimony of Mr. Conception, who was also present at that party, and testified that he didn't see Petitioner do the shooting, but that White was present and had a gun with him that night. In addition, Conception further testified he didn't actually see who shot Green. And then White, whom McCain had identified as the killer, asserted his Fifth Amendment privilege in front of the jury. And White denied that he had confessed to the killing of Green. And finally, Petitioner himself denied having any involvement in the shooting. And all that, by the way- Did Mr. Lehman look at the juvenile court judgment? Yeah, Mr. Lehman did. We do have evidence that Mr. Lehman had before him the juvenile court file, which would include the judgment. That's correct. And he didn't realize that the charges against Mr. White had been dismissed? Well, specifically the claim whether counsel was ineffective for not putting forth or not objecting to the assertion of the Fifth Amendment by White. Of course, that was a claim that was dealt with by Judge Wardlaw when she was on the case. And that was- of course, that isn't a claim that's been certified. No, I'm not looking at it in terms of a claim. I'm just, you know, you went through all this, through what, Judge Pregerson and Judge Brenham. And I just raised, you know, it seems kind of troubling that Mr. Lehman wouldn't have realized. Well, and in fact, I think- It permeates the whole, you know, Mr. Lehman's representation here. And I think our argument is also discussed by Judge Wardlaw in her ruling on that claim, as to why we believed that it was not unreasonable for Mr. Lehman to believe that Mr. White still had remaining Fifth Amendment privilege. It was rejected by Judge Wardlaw on those grounds. But Judge Wardlaw, nevertheless, examined specifically that claim and rejected that counsel was prejudicially ineffective under this trickling. And I think going back to the child abuse claims, that in addition to the fact that no person interviewed by the penalty phase investigator, Casey Cohen, divulged such information. And his records are before the court as well. Well, the record is before us, but I join with Judge Paez in wondering what the lawyer had read and seen. It's quite clear that he didn't do much with the prior transcripts or the record of the prior trials, because he was completely ignorant about many things that he should have known. Well, I don't know. I think I disagree with you, Your Honor. In fact, I think if you were to, I think going back in counsel's shoes back in 1986 at the retrial, that we have to first recognize that there had already been two trials and that counsel, as recognized by Judge Pragerson, the counsel at that point essentially had been, the case had been laid. This is found by Judge Pragerson. This is not just counsel himself. That counsel had before him a record that laid out the case essentially that he was required to present at that point, and that was from petitioner himself and the California Supreme Court directing him to present evidence of mental health evidence at the special circumstance phase. But when you're doing mental health, you go right back to the beginnings. You get a drug history. You get a childhood history, and he didn't do those things. Well, the drug history had already been found by Dr. Siegel. Yes, he didn't even know that it had been done. Well, according to Mr. Lehman, never testified he didn't know that one had done. In fact, he knew that a prior history had been recorded by Dr. Siegel. So it was an oral history. That's correct, and pursuant to his testimony. But more importantly, he didn't just rely on that. He actually had Dr. Siegel retained to testify at Frierson III. No, he never retained him. No, actually, Your Honor, that's incorrect. Dr. Siegel was retained, but he was not used by counsel. He was not called as a witness, but he was retained. And, in fact, the records show that he was actually retained for Frierson III, and he spoke to him on three separate occasions. And this was partially the subject of the reopened evidence you're hearing by Judge Pragerson as to what occurred between them. And once again, it's important to point out that Dr. Siegel was not counsel's indication of the case that should have been presented at Frierson III. The counsel indicates that their best case was presented through Dr. Wilkins, which was their expert at the habeas proceedings. In fact, had Dr. Siegel been the issue as should counsel have called Dr. Siegel at the retrial, I would have presumed that Dr. Siegel would have been an important witness at the evidentiary hearing. But, in fact, he wasn't. He wasn't called or listed by either party, because the point was not that counsel was ineffective for not calling Dr. Siegel. The point was counsel believed that he was ineffective for not putting on an expert such as Dr. Wilkins. And the pharmacologist. That's correct. It could have been Dr. Siegel or it could have been somebody else. And I think that's important because. Somebody else. That's correct. But in this regard it's important because he had retained Dr. Siegel, And both judges Pragerson and Moreno upon this record looked at Dr. Siegel's testimony and concluded that counsel was not required to go expert shopping after concluding reasonably that Dr. Siegel would not have made a good witness for the proceedings at which he was called. And the important point here is this. Because we were at a retrial where counsel was required by the California Supreme Court and petitioners clearly expressed desire to put on evidence of mental health at the special circumstance phase, rather than at the penalty phase where it had been presented in the first retrial, that counsel then had to put on a witness who could attack the mental state necessary to commit the special circumstances. And the problem with Dr. Siegel is the best he could do from his testimony was state that while petitioner could form the intent to rob, he could not form the intent to murder. And the court found and Mr. Lehman found that that wasn't going to help at the special circumstance phase. What he needed and what he got through Dr. Gillick was an expert, a child forensic psychiatrist, a board certified in fact, who had interviewed petitioner and came to the conclusion that he could not form the intent to rob or murder, that his mental state wasn't able to. So the problem with Dr. Siegel's testimony and one of the reasons why, pursuant to counsel's notes of his phone calls with Dr. Siegel, is that Dr. Siegel if presented at the special circumstance phase would be a weaker witness than he was at the penalty phase. Because now he's forced to testify into a phase concerning mental state when he had already conceded in Frierson 2, the first retrial, that petitioner had it pretty much together and could form the intent to rob. And no expert has come forward, as found by Judges Pragerson and Moreno, for a medical or documented scientific explanation for why petitioner could form one intent to rob, but not form the intent to murder. And so that's an important distinction to be made between and the position of Mr. Lehman when he steps into the case at Frierson 3. Your discussion here was precipitated by the concern that maybe he hadn't read the transcripts of Frierson 2, or that he hadn't read the report. If he'd read the transcripts of Frierson 2, he would have realized that Dr. Siegel had prepared a written report. And if you read the written report, there's a drug history there. And there's no evidence, I don't think, that he understood that Siegel had prepared a drug history report. He abandoned the use of Dr. Siegel, even for the potential that it might have had at the penalty phase, without even considering reading. It doesn't look to me like he read the transcript. If you read the transcript, it's pretty clear. Siegel testified about the difference between acute and chronic and makes references to the report. Well, I think if you're going specifically to the differences between acute and chronic... No, no. It has to be of some concern that he didn't consider, or it just appears to me he didn't read the transcripts of Frierson 2, or the report of Siegel. I think the issue there specifically was his neglecting to know that there was a prior written report, because he had been informed by counsel that it had been oral. And reading of the transcript would indicate there was a written report. I don't think there was a finding, nor has there been, that he never read the record. Whether his recall from reading the record was incorrect as far as a written report, that's conceded. He did not know from his testimony at the evidence you're hearing that there was. But the point as to whether drug history had been performed, the answer is yes. And, in fact, the petitioner's drug history was presented through Dr. Gillick and through the recipient witnesses who testified at trial concerning his drug history. So, and then the important point then, once again, is going to the issues that were specifically addressed by judges Moreno and Frierson is, what use would the drug evidence have made? What could we make of that at the special circumstance or penalty phase? And that's what the court addressed specifically through Dr. Wilkins. And the court recognized that through the habeas experts, their best expert, their best case, what they believed should have been presented is that there was a lot of problems with Dr. Wilkins' testimony. And, in fact, it wasn't held that helpful. In fact, the problems with Dr. Wilkins, you know, as set forth in our brief and as set forth by Judge Moreno at 2763 and 2764 of the excerpts, he never interviewed Petitioner. This is their expert that they believed should have been presented as the best example of a psychopharmacologist. He never interviewed Petitioner. He based his conclusions on a hypothetical created by counsel and was asked to assume facts were true. He was asked to unquestioningly rely on Zandra Woolley without knowledge of her prior convictions, including for forgery and false statements. He did not review any medical reports, any transcripts, any witness declarations, any police reports. So their best testimony from Dr. Wilkins was presented without presenting him with all this background material. And at the same time, they're saying that counsel was ineffective for not presenting information to their experts. Nevertheless, when Dr. Wilkins was cross-examined, he couldn't, you know, he couldn't testify as to how much PCP was consumed or was in Petitioner's system. He couldn't determine how potent it was. He testified that he agreed that his opinions as to whether Petitioner suffered from PCP intoxication depended upon the accuracy and reliability of Zandra Woolley. And yet he hadn't taken her prior convictions into account. So he would have to question her reliability. In particular, he didn't take into account the fact that Zandra Woolley was convicted of being an accessory in this case. He was not aware of Petitioner's own testimony as to what he had consumed. And the fact that this amount that Petitioner had already testified to was substantially different from that testified to by Zandra Woolley. He testified he couldn't know, he would never know how much drugs Petitioner ingested, that he couldn't say for certain that Petitioner became confused and paranoid during the robbery, that someone on PCP could nevertheless form the requisite intent, that he believed Petitioner could form the intent to rob, that he testified there was no hard science to support the hypothesis that PCP could impair an individual's judgment while leaving lower-level functions intact. He testified he could not opine as to any reasonable degree of scientific or medical certainty the extent to which PCP contributed to Petitioner's poor judgment. He testified he agreed that the facts of the case suggested a certain level of mental acuity. And the sum and substance of Dr. Wilkins' testimony concerning Petitioner's mental state in line with the drug use was that his belief was that the shooting of Mr. Kramer and Bonas was aberrational, but admitted that the fact that the Petitioner committed two armed robberies in the month cut against it. And his belief was that the shooting was aberrational because there was no need for him to shoot, that he could form the intent to rob, but the fact he couldn't form the intent to murder because there was no reason for him to commit those crimes. Well, of course, one reason that was presented to Dr. Wilkins on cross-examination at his deposition was elimination of witnesses. And, in fact, all the indications were that he was making the victims drive to a less visible location, directing them so that they wouldn't be seen. And, in fact, the fact that the victims kept looking back at him, of course, indicated that they had, in fact, got a good visible look at him.  And, specifically, Judge Moreno, addressing the counsel's best case as to what a psychopharmacologist would present, Judge Moreno found that, this is at 2767 and 2768 of the excerpts of record, that Dr. Wilkins' testimony demonstrated that even if counsel had gone expert shopping, it would have not assisted the defense in any meaningful way. At best, Petitioner would have obtained an expert like Dr. Wilkins, who could only testify that Petitioner's behavior at the time he committed the crimes was consistent with PCP intoxication, but not that he was actually intoxicated. And the expert would similarly have had to concede that, despite any alleged intoxication,  So, once again, it would have been presenting an expert that would have actually contradicted the expert he had presented on mental state. Dr. Gillick testified he couldn't form the intent to rob or murder. He would have had been, their argument is now, that he should have presented an expert instead, who wouldn't have had as strong an opinion. And, in fact, Dr. Wilkins endorsed scientific principles that would have seriously undermined Petitioner's proposed defense, and that's that, as set forth by Judge Moreno in his order. So, I think, and specifically regarding the testimony of a psychopharmacologist, that this was precisely the issue of the two-week evidentiary hearing held before Judge Moreno, and precisely the issue revisited by Judge Pragerson at the reopened evidentiary hearing. And both Judges Pragerson and Moreno looked at the entirety of that case, particularly Dr. Wilkins in this regard, and found that it wouldn't have assisted the defense in any meaningful way, and, in fact, would have contradicted the reasonable strategy and defense that counsel did put on at the penalty phase. Let me kind of change your focus a little bit. Judge Moreno, throughout his opinion, listed places where he thought that counsel was incompetent. Could you review those for us? The specific findings by Judge Moreno? Yes, the incidents where he thought that he was incompetent. I could pull the order out and go through some of those with you. I do note that... This is like a hundred pages. Right, and, in fact, those same findings towards the areas where he did find that, under prong one, that Mr. Lehman should have done more, that he did, of course, all reject all of them under prong two, under Strickland, and, in fact, those same... Well, I know all that. I just thought perhaps you could give us a summary of those, but you can't. I don't have... I could pull the order out, and I probably have them underlined and red flagged, but I'm not sure that would assist the court. I think this kind of highlights a problem that I have with the case, and that is that this lawyer who was hired, he claimed he'd had one capital case. He was fired by the... Well, he quit because he was going to be fired by the public defender, and before the judge who hired him was challenged to his competence in another case, and as you look through and see what he did, time after time it was just very lackadaisical or incompetent  Why he was ever hired, to me, is scandalous. Well, but I think, Your Honor, I think the important point in those areas in which Judge Moreno looked at the specific claims of counsel, it's a 99-claim amended petition, the court looked at the claims where the court found that counsel had not acted as he believed, Judge Moreno believed he should have, and found that those were not prejudicial, but even more importantly, that Judge Pragerson looked at those same instances where it was found counsel should have done something differently and rejected under the cumulative error claim, which of course is not before the court, is not certified, but looked at those... Was it argued, is it an issue before us, even though uncertified, if we decided to be certified? Well, the uncertified claims, pursuant to, I think, Rule 21-F, could have been the subject of additional briefing by the parties, but I don't think that additional briefing is necessary, but it is required before the court can grant that, and I would... If you decide to expand the certificate of availability, then you have the right to... Sure, and I know that is a possibility, but I don't believe it's necessary for this reason, that I think, to a large extent, this case in the court is dictated by the standard of review, and I think it's important, as the court has recognized, to recognize the height of the hurdle. Petitioner must clear, when attempting to convince this court, that the facts found by the district court were clearly erroneous, and I... I have a question on this with Mr. Rucker. Do I understand correctly that Judge Moreno, in effect, found that the child abuse evidence was late and not very probative, maybe not even very credible? The court looked at it in two ways. But he didn't have a hearing. He never heard these people testify. He heard some of them testify. He heard Mr. Herring, he heard Amarita Herring, he heard the petitioner's brother. Who were these folks? Petitioner Amarita Herring, in fact, submitted a declaration, put forward her direct testimony declaration, in which she indicated that such abuse, in fact... She was a neighbor, wasn't she? That she was a neighbor since 1965. She continues to be a neighbor of the Friarsons, I believe. And at, I think it's at page 90, and this was addressed by, of course, Judges Pragerson and Moreno, that... The import of her testimony was what? Was specifically that she didn't believe such abuse took place. No, I understand that. I'm talking about the people who say it did occur. Okay, well, their testimony backed up, and in fact... Did they come in and testify before the judge? Some of them did. Petitioner's brother testified, Mr. Herring testified, and there was... I don't have the list of witnesses in front of me. There was live testimony as well as uncross-examined testimony, and the importance of that is this. The importance of that is this, that the court looked at the entirety of the abuse evidence that was put before the court, and stated, even if unimpeached, even if those witnesses had been available to testify, and had so testified pursuant to their declarations, and had been unimpeached, as for the witnesses we didn't cross-examine, so their testimony came in uncross-examined, that that wouldn't have made a difference. And the court, so the court specifically looked at and addressed that. It did, and one of the reasons it wouldn't have made a difference was that they were, they had an inherent bias. They could have been cross-examined with the bias. But the court's findings on that were not based, are not exclusively a credibility call. That they were, the court looked at it both ways, that this testimony unimpeached wouldn't have made a difference. And one of the reasons why is because it came forward after two retrials. Excuse me. It only came forward after two retrials. That was their credibility. Right. But, no, and it goes to the fact that even, that they could have been impeached. But it doesn't, the court, right, but the court didn't make a finding necessarily that these, the witnesses themselves were incredible, or didn't, a finding of, they lacked credibility. What the court found was that their testimony could have been impeached. Which means that, what, it wouldn't have changed the result? That's correct. And they would have been impeached with a lot of the things I've already referred to. The fact that petitioner's mother testified in her oath it didn't occur. Petitioner's father testified it didn't occur. The petitioner has never to this date ever stated that he was abused, has never put forward a declaration or testified that he was abused. That every, all contemporaneous records are silent concerning abuse. And that there's no reference to such abuse in any of the documents. No person interviewed by the defense experts, actually defense investigators showed such abuse. That the witnesses did have an inherent bias. And that it would have been impeached as well with the neighbor and et cetera. So. If you'd wrap up, you're out of time. Sure. Well, thank you, Your Honor, and subject to any questions, I'll submit. Thank you. Thank you very much, Mr. Matthews. Mr. Rucker, back to you. Thank you, Your Honor. I think it's important to note just in passing that this case in the district court level went through four different judges. None of whom ever took a look at the entirety of the case. Now, with regard to the question of notice. If this court requires trial counsel to be put on notice of a fact that requires him to then start an investigation into an issue, such as child abuse or brain damage, it will be walking away from the Supreme Court decisions and the long line of authority this court has established. And that is this. And it's the most important premise of our case. And that is the first thing trial counsel must do is to perform a reasonable, thorough mitigation evidence investigation. Once that is done, then counsel is in a position to sit down and decide which areas he'll pursue, which he'll abandon. We all have limited resources. That's understood. Every case is different on the facts. But you start with first just a fundamental investigation of the facts. That was not done. His investigator was hired just for the special circumstances? Solely for special circumstances. The guilt of the special circumstances. That was quite clear. His investigator asked no questions of any family members with regard to background and with regard to Casey Cohen's file, which trial counsel never read. It's not a question of whether he didn't remember. It's a question that he never read it. According to his declaration that appears at page 2626 of the extract of records, quote, I never saw or reviewed Casey Cohen's file on the Frierson case, which was attached. I never spoke with Casey Gordon regarding the Frierson case. And your honor had a question with regard to the Nuremberger report. And I stand corrected. What I was referring to and quoting to the court is not what appears in his report, but what would have been told to trial counsel if he had picked up the telephone and called Dr. Nuremberger that his investigator said was willing to talk to him. And at that time, Nuremberger, according to his declaration at excerpt of record 2656, would have said I was very familiar with the psychiatric profile Mr. Frierson presented. It is not unusual to see this pattern in persons who suffer from physical abuse at the hands of one or more caretakers and or who suffered from structural brain damage. And counsel never interviewed any family members with regard to this abuse. That's why they didn't come forward. That's why we have this gap. With regard to reading the transcript, I think the evidence is even more compelling that this trial counsel never read the transcript of the second trial, because not only is Dr. Segal. Had he done so, what would that have accomplished? What would it have accomplished is the following. One, he would have known that his own expert, Dr. Gillick, had prepared a report and would not have stood in front of the jury and exclaimed that he wasn't aware that his own expert had prepared a report. Okay, so he didn't know there was a report. How would that have advanced the ball? The ball would have been advanced because a direct examination of Dr. Gillick would have been more comprehensive. Dr. Gillick's testimony, which is extremely brief on direct, did not include any of his credentials. His opinions were conclusionary and not backed up by any facts or substantial reasons for his conclusions. And then a jury is instructed that the weight to be attached to an expert's opinion is to be weighed according to the basis of the opinion. Anything else? Segal's report, he read from it six times in the transcript. And this trial counsel says he wasn't aware that Segal had prepared a report. And Segal would have testified, had he been called, that he could form the intent to rob and not the intent to murder and formed no opinion on his mental state at the time of the murder. Not exactly. He would have testified, one, of a detailed drug history, which he testified to previously, concluding that on the night of the crime, Lavelle Frierson was, quote, severely intoxicated. And that evidence came in anyway through Zandra Woolley and others, did it not? It came in, but without the scientific basis of what chronic use constituted. In terms of his history, the jury heard his history of abusing PCP. No, no, the jury did not hear his history. The jury heard from Zandra Woolley and other witnesses that on prior occasions they had seen him under the influence, but nothing of a history that an expert could classify him as a chronic user, which is a status that has particular relevance with regard to the muting of motor skill that was used by Bullness to, by the prosecution to show he wasn't under the influence. And at the same time those motor skills are muted, the ability to exercise judgment and the mental state is impaired. And he would not have been, most importantly, if he had read the transcript, trial counsel would not have been confused according to the district court's finding as to what Siegel was saying and could have called a psychopharmacologist that trial counsel under oath said would have been the best type of witness for him to put on. He directed, after his conversation with Dr. Siegel, he directed his investigator to find me another doctor, not a police officer. And it was the investigator who selected this witness, Mr. Trout, who was a police officer, not a psychopharmacologist. And trial counsel never spoke to this witness, his expert, prior to the very day he showed up in court to testify and was put on the stand. So it's not a reasoned decision, a tactical decision, that he wants this type of witness as opposed to an expert. Mr. Rucker, would you sum up if you would, please? Yes. That the question with regard to forming the intent to rob, Dr. Gillick did say that at page of the reporter's transcript, page 896 of Frierson 2, that petitioner could form the intent to rob. But that is not the critical mental state issue. The mental state required for special circumstances is premeditation and deliberation, which is a much higher standard than the mere mental state required for an intent to rob. And just to conclude, that in the district court's conclusion with regard to the importance and persuadability of the evidence with regard to drug history and the evidence with regard to Dr. Wilkerson, who we had to pay out of our own pocket to testify, that's why he gave a hypothetical response, was that he used the wrong legal standard. The district court felt there had to be a nexus between the mitigation evidence that was presented and a defense to an element of the special circumstances. That is not the law. Tenard v. Dredke, Smith v. Texas say that there does not need, and the court needs to consider when the wrong standard is used whether that prejudice and that reliability is there. Thank you very much. Thank you, Mr. Rucker. Ms. Freeman, thank you for your fine briefs. And you, too, Mr. Massey, the case to start you to submit.
judges: B. Fletcher, Silverman, Paez